Good morning, ladies and gentlemen. Our first case for argument this morning is the Boeing 737 MAX Pilots litigation. Mr. Jones. Thank you, Your Honor. Good morning. My name is Patrick Jones and together with my colleague and co-counsel, Mr. Joseph Wheeler, we represent the plaintiff appellants in this case. Of my 20 minutes allotted, I'd like to reserve two minutes for rebuttal. The district court dismissed the plaintiff's claims of fraudulent concealment, fraudulent misrepresentation with prejudice. It held that the plaintiff could not prove that the damages suffered by the pilots was caused by Boeing's fraud. Second, the district court held that the plaintiff failed to plead fraud with particularity. And third, the district court held that as a matter of law, there was no special relationship between Boeing and the Boeing certified pilots. I'll address each of these issues in turn, but first I'd like to address the basis on which the district court granted the motion to dismiss with prejudice and didn't allow an opportunity for the plaintiff to amend the complaint even before it had engaged in any discovery. This court may reverse a district court's decision to dismiss a complaint with prejudice if it finds that the district court did not provide a reasonable explanation for why it denied the plaintiff an opportunity to amend. In this case, the only explanation provided by the district court for dismissing this case with prejudice was that the plaintiff had filed too many, quote, versions of the complaint. That explanation was not only arbitrary, but it was also somewhat misleading. All but in this case, the plaintiff filed four versions of the complaint, but each one of them was either requested by the district court and was purely administrative, except for one, which amended the complaint to add account for fraudulent concealment and delete account for intentional infliction of emotional distress. Mr. Jones, did you ever make an offer or proffer as to what you would have done in a fourth amended complaint? Yes, Your Honor. As you may know, and as we put in our brief, since the case was filed, Boeing has admitted to certain fraudulent conduct to the Department of Justice. Right, so after the deferred prosecution arrangement in the Justice Department in the SEC resolution, did you specifically identify those items as warranting a fourth amended complaint? We did not file a motion to amend. We did, however, file a motion for the district court to take notice of the deferred prosecution agreement and provide them with authority, seventh circuit authority, to do so, and the court denied it. So the court was aware of the content of the deferred prosecution agreement and the admissions that Boeing had made. Were the plaintiffs allowed to amend the complaint in this case, to your point, Judge Scudder? The plaintiff would have amended the complaint to include Boeing's admission that the training materials and the flight manuals provided to the pilots, directly to the pilots by Boeing, were, quote, materially false, inaccurate, and incomplete. That's from paragraph 46 of the DPA. The allegation is they were sent directly to the pilots, am I right? That's correct. They were sent to the airlines who then gave them to the pilots. I see. But the training materials and the FCONs, the flight manuals, were actually protected, and Boeing actually asserted a copyright in those documents. So they were sent by Boeing, and they were Boeing's representations. No question about that. Sent to the airline companies, not sent to a list of all known pilots. That's correct. That's correct. But Boeing obviously knew that they would be conveyed to the pilots. And the pilots actually had to review the training materials in order to get certified to fly the MAX. The plaintiffs also would have amended the complaint to include Boeing's admission that its fraud was the direct cause of their airline customers' monetary damages. That's from paragraph 12 of the DPA. We have also amended the complaint, and will amend the complaint if granted, to include Boeing's admission that the FAA relied on Boeing's fraud to certify the MAX with only a differences training requirement for pilots to get certified to fly the MAX. And that's a very low standard, which made it very enticing and very easy for pilots to transition from one type aircraft to another, to the MAX in this case. Finally, the plaintiffs will amend the complaint to allege that the fraudulent statements that Boeing made to the FAA and to its airline customers were substantially similar, if not identical, to the fraudulent statements that they made to the pilots. Therefore, because the reason given by the district court for dismissing the case with prejudice without an opportunity to amend was arbitrary and somewhat misleading, and because it would not have been futile to allow the plaintiffs to amend the complaint of issues that the court was aware of, this court should remand this case and allow it to proceed to discovery. Now to the specifics. Approximate cause, pleading with particularity, and the existence of a special relationship. Boeing's misrepresentations and half-truths made directly, as I stated to Judge Ripple, to the pilots were the legal proximate and but-for cause of the damages suffered by the pilots. In its opinion, the district court recognized that in a fraud case, as opposed to negligence, the causal link between the wrongdoer and damages is provided by the concept of reliance. And in this case, each of the plaintiffs clearly pled that had they known the whole truth about the MAX and the safety concerns that it posed, they would not have sought certification to fly the MAX and they would not have continued to fly the MAX if that information was ever disclosed, as it was after the crashes. The court disregarded these allegations, however, and instead theorized that the plaintiffs had a timing problem. That is, the district court theorized that the plaintiffs couldn't have relied on Boeing's misrepresentations to commit to the training and the certification because by the time they could have learned of the whole truth about the MAX, they were already there. Mr. Jones, I've got a question on the reliance prong in particular. In your reply brief, you can answer this when you come back up. I don't mean to give you a quiz on the spot here, but in your reply brief on page 15, right in the middle of the page, you have a series of citations to the third amended complaint that I think are what, in your mind, you were trying to point us to on the sufficiency of the pleading with respect to reliance. My question is, are those what you're putting stock in here? Are those the best citations? I looked at each one of them, and when I tried to trace them through, the allegations of reliance seem quite thin to me. They seem conclusory, and they seem kind of categorical with respect to all pilots that way. So, you can respond now or later. Sure. I'll respond now as best I can, and then I'll take a look when I sit down. But the reliance in this case is sort of a negative, because the plaintiffs, the pilots, relied on Boeing's representations that the FCOM and the training materials were complete. So, put yourself in the pilot's shoes, for example. You've got the computer-based training materials that Boeing created and sent to the pilots. That was basically a 20-slide PowerPoint presentation, followed by a short quiz. You're going through the PowerPoint presentation, reviewing the differences between the 737NG and the Boeing 737MAX, and if those representations were complete, then you would have come across a slide that said something along the lines of, By the way, the MAX also contains a new system. We call it the MCAS. It's the Maneuvering Characteristics Augmentation System. And if we're being honest with you, we don't know how to handle a malfunction of the MCAS. If the MCAS malfunctions, you, your passengers, and your crew are all going to die. Now, the court, the district court, said that that wasn't reliance because they had already committed to the training. This completely disregards the fact that the pilots alleged that if they had learned about that, they would have walked away. They could have just put down the iPad and gone back to their jobs flying other aircraft. Yeah, I guess the observation that was sticking out to me, and I may be mistaken, you can tell me I am, is that I would have thought you would have had a paragraph or a few paragraphs in that complaint, in the Third Amendment complaint, that were specific as to pilots that said, Look, make no mistake. There were two awful tragedies. Two planes went down. Everyone died. So I, as a pilot, was quite attuned to safety considerations regarding this particular plane. And I was paying close attention to what was coming out of Boeing, the manufacturer, with respect to this aircraft. So I was paying attention to the training manuals. I was playing, you know, the training materials. I was paying attention to the flight manuals. And they didn't make any representations at all about the difficulties they were having, you know, with the altitude system. Sure. To shorthand it that way. That's what I didn't see in the complaint. Your Honor, I think the complaint repeatedly alleges that each of the pilots reviewed the training materials. They had to to get certified to fly the MAX. And each of the pilots reviewed the FCOMs. They do that on a routine basis because that's basically the operating manual for the MAX. The complaint alleges that each one of them reviewed those materials and relied on the representations they were in. And if the representation had been made by Boeing that the MAX contained the MCAS and that it could cause the plane to dive into the ground, they would have not flown the MAX. They would have walked away. I find this a little surprising. The failure of any part or piece of software on a plane can cause it to fail. So in your view, as a matter of law, must the manufacturer state with respect to each part in the plane that if it fails, that failure can cause a crash? No, Your Honor. Then these manuals would be endlessly long. I just bought a new car, and the safety manual is yea thick, all of which is filled with government warnings of that kind, making it completely useless because no one can read it. The pilots read these. They're required to. And they don't – the manuals don't say that if this malfunctions, it'll crash. But that's what you say the manual should have said with respect to this system. Right. But everything else in a plane, that is also true of. No, that's not correct, Your Honor. If the ailerons fail, the plane will crash and so on. Oh, yes, it will. No, Your Honor. That's perfectly straightforward. The FCOMs are drafted to identify safety concerns, and in case of a malfunction, what steps to take to combat that. Yes, and if the engines fail, the plane will crash and so on. What distinguishes this bit of software, other than the fact that this one turned out to have a flaw in it, from every other single point of failure in a plane? What distinguishes it is that Boeing knew that this was a safety concern, and they also – It knows that the ailerons are a safety concern and the rudder and so on. And if those systems fail, there are directions, instructions in the FCOM on how to compensate and correct those failures. But Boeing knew that there was no way to safely manage a malfunction of the MCAS. That's why they left it out of the FCOM. I think you're just saying there are no other single point of failure problems in a plane, which I don't believe is true. Let me ask you a question along different lines. Your basic contention is that Boeing should not have shipped the 737 MAX until there was no risk of failure in the software. Suppose Boeing had done that and just deferred delivery. What would have been the effect on your clients? They would have continued to fly the planes they were certified to fly. And why couldn't they continue to do that when the 737 MAX was unavailable? That's the question I'm asking. Right. Planes are often delayed, and the pilots presumably fly some other plane that they used to be certified to fly or that they recertified to fly. Why is this any different from that? You're absolutely right, Your Honor. The MAX should have been delayed. I am not right about that or not. I'm identifying that as your principal observation. And I'm trying to figure out how your client's injury is different from what would have happened had the 737 MAX been delayed for two years. That, of course, is what did happen as a result of the grounding orders. But suppose Boeing had not delivered it at all, and your clients obviously couldn't fly it if it's not delivered. Right? How is your client's injury different in the non-delivery situation from the delivery followed by grounding situation? Well, if Boeing had delayed the MAX until it was safe to operate, there would have been no injury. We wouldn't be here. You mean no one was trained to deliver the MAX until it had already been delivered? No. Pilots are trained on planes before their delivery date, so they can actually be flown when they're delivered. To answer your question, if the MAX had been delayed, the pilots would have continued to operate the planes, the aircraft type that they were certified to operate. There would be no damages. We wouldn't be here. Well, I don't get it. The premise of your complaint is that once they're certified to fly the MAX, they can't fly anything else, and so they can't fly. So I'm giving you a situation in which pilots train, get certified on the MAX, and Boeing doesn't deliver the MAX because it's working on the software. Do you have a suit? No. Why not? Why is that any different from delivery followed by grounding? That's the kind of question I'm asking. Because the pilots would then still be certified to fly their own aircraft types. The certification expires after a time unless you renew it. Well, so why couldn't they renew it? They could have. They could have, and there would be no damages in this case if Boeing had delayed the delivery of the MAX until it was safe to operate. But that's my problem. I don't understand. I understand why people who are on the doomed planes have a claim, but I don't understand why your client's claim is any different from what happens if Boeing delays the deliveries rather than delivering and then grounding a set of planes. Because they admittedly committed fraud on the FAA, the airlines, and the pilots to get the MAX certified. I'm asking about why your client's claim is any different. You tell me that in the delayed delivery situation there is no claim. Then tell me in a simple way why delivering and then grounding is any different from delayed delivery. For one, because they committed fraud. For two, because the MAX was in operation for three years before it was grounded. By that time, all the pilot certifications on other aircraft types had expired. That's the difference. If the MAX had just been delayed, they could have continued to fly under their existing certifications. That's the difference. Mr. Jones, may I ask you a question about the types of fraud you've alleged in your complaint? As I understand, you've alleged both fraudulent misrepresentation and fraudulent concealment. Am I correct? That's correct. With respect to the special fiduciary obligation that we find in Illinois law, is it applied to both of those claims or only to one? There must be a special relationship in order to prove the elements of fraudulent concealment, not fraudulent misrepresentation. Now, on the fraudulent misrepresentation, what difference is there in substance between that and your fraudulent concealment claims in this, according to the allegations in your complaint? Right, right. That triggered that difference in the elemental requirements. Right. The elemental requirements are that fraudulent misrepresentation requires an affirmative representation, whereas the concealment is, in this case, they didn't provide any information about the MACs or how to manage it in the case of a malfunction. That's the concealment. And to have that, they have to have a duty to disclose, which is the special relationship, which the plaintiffs adequately alleged in this case. This seems different, though, than the kind of fiduciary obligation that we usually see in the Illinois cases. Is this really a fiduciary obligation relationship? I think it rises well above that, and that's a question of mixed law. Tell me why. That's a question of mixed law, in fact, that the district court shouldn't have decided. But in this case, the plaintiffs alleged that they were in a position of weakness, dependence, and, quote, trust, justifiably reposed on Boeing. And where am I going to find that in your complaint? That's, it's, I can give it to you on rebuttal, but it's pleaded ad nauseum throughout the complaint. That Boeing, that the pilots were in no position to review and confirm or dispute the accuracy or the completeness of Boeing's representations made to them. They were completely in blind reliance and total reliance on Boeing for their safety. Thanks. And that's set forth in two versions of the FCOM and the training materials. I can see I'm out of time. Thank you, Counsel. I'll give you two minutes for rebuttal. Thank you. Mr. Primus. Thank you, Your Honor. Craig Primus for the appellee of the Boeing Company, and may it please the court. The district court's order dismissing the case should be affirmed for the straightforward reason that plaintiff pilots have not and cannot plead the element of proximate cause. This pleading failure required dismissal of both the fraudulent concealment and the fraudulent misrepresentation counts, and those are the only two claims that plaintiffs appealed. Essentially, plaintiffs are asking the court to recognize a cause of action that would effectively be an insurance policy to replace lost income whenever a product is recalled or taken off the market and has a negative impact on workers that rely on that product. And that's an extraordinary proposition for which they cite no cases. They cite no case under Illinois law recognizing resembling a claim anything like this one. The complaint is clear, paragraphs 120 and 174, that plaintiffs' alleged economic harms flowed from the grounding of the MAX. But the grounding wasn't caused by statements made to the pilots in training. It was the end result of a chain of events that involved a lot of other actors and a lot of other decision makers, but not the pilots in this case. It starts with the design of the MAX, and then there were two crashes that involved other pilots, other airlines, and other passengers, and then the decision to ground the MAX, which was made by regulators around the world. And that, in turn, led airlines to make their own decisions to alter their schedules. Stop. Please. I'm OK. I'm all right. Thank you. You need a new chair. May the government may. Thank you. I think we have a coast roller on it. Do you want a break? No, I'm good. I'm good. Thank you. Sorry. I'm sorry, counsel. Certainly, Your Honor. Would you like a moment? This is obviously a shocking oral argument. I was just taken back by your argument, counsel. I've been doing this a long time. It's a first for me, and the power of the words. Sorry, Judge Ripple. I hope Your Honor is OK. Would you like to proceed? Sure. Thank you. So the point I was making, in somewhat dramatic fashion, was that all of these decision makers made independent decisions that impacted the pilots. And they flow through this long chain of causation with lots of intervening causes and downstream effects. They don't seek damages under their own theory of the case for what they actually allege was the injury. Cases like this court's decision in Dundee Cement, Illinois Appellate Court decisions in Kraft Chemical and Philip Morris, which in turn cite a series of federal decisions, including this court's decisions and the Supreme Court decisions in Holmes and Associated General Contractors, they all stand for the proposition that there has to be a direct relation between the injury alleged and the harm alleged. And here they cannot make that link as a matter of law. And I think Judge Easterbrook's questions hit on that point, the difference between delaying delivery and would they have a claim versus delivery and then a grounding. The pilots made decisions. The airlines made decisions as to whether to keep the schedule the same. And regulators made decisions as to whether to ground the airplane or not. And Boeing did not make those decisions. Those are all the steps in the chain that make it impossible for plaintiffs to plead or prove proximate cause. And Judge Easterbrook also hit on another point, which is that these pilots are certified to fly other aircraft. And the whole concept of the MAX was that it would be a plane that a 737NG pilot could easily move between. So by definition, most of the pilots were already certified on the existing 737s. Whether the airlines changed their schedules in light of the grounding and whether the airlines staffed these particular pilots on different flight schedules, that might have caused them to lose wages. That is not something that Boeing can or should be responsible for. Mr. Primus, can I just to get your introductory comments are helpful. I just want to get the benefit of you see where you differ with your colleague on the other side. And that is with respect to the importer lack thereof and what happened in the Justice Department proceedings and the SEC proceedings. Because as you know, Mr. Jones quite clearly features what happened there in a lot of his arguments. And in particular, in the reply brief, he emphasizes what he sees as admissions that your client made to the Justice Department and to the SEC that are characterized as being quite direct to the pilots. So I'll get the benefit of your reaction to that. Yes, Your Honor. The deferred prosecution agreement does not contain any statements made to the pilots in this case. It involves statements made by two Boeing employees to an employee at the aircraft evaluation group of the Federal Aviation Administration. The pilots don't appear in their statements that they allegedly relied and do not appear in the deferred prosecution agreement. It's just not about them. But more importantly, the point that the plaintiffs are trying to draw from the deferred prosecution agreement, which is that Boeing made misrepresentations lie to the Federal Aviation Administration's aircraft evaluation group, those are already in the complaint, which had to be assumed to be true. So adding the deferred prosecution agreement to go back and amend to add it will add nothing, because in paragraphs there are at least six that I saw, 110, 126, 139, 140, 152, and 204. They all point to this exchange between Boeing employees and the Federal Aviation Administration. The most on point, I believe, are 139 and 140, which say that Boeing knew that disclosing what it knew about the MCAS and the inability for pilots to manage any malfunction to the FAA would prevent certification and prevent sales of the MAX. Then 140 says that to expedite the FAA certification and facilitate deliveries, Boeing made the deliberate and conscious decision to remove and conceal any information about the MCAS and pilots' inability to safely manage it in the case of a malfunction. So we have a situation where the deferred prosecution agreement, which Boeing stands by and can't contradict on the facts on its terms, it doesn't speak to the plaintiffs in this particular case. And in all events, the plaintiffs essentially paraphrased what occurred in the deferred prosecution agreement, so its addition would not have added anything. So those are two reasons why it wouldn't change the result and why the amendment should not have been allowed to provide for that. With regard to the question of the special relation, if I could move off of proximate cause. With regard to the other grounds for affirmance, I would just say that the proximate cause ground is the only ground that the court would need to affirm on. There are a lot of other issues that were raised and addressed below. So I will just touch on them briefly. With regard to the fraudulent concealment claim, Judge Ripple, you asked some questions about the special relationship under Illinois law. This court said in Wygod, and it was relying on Illinois appellate decisions, that it is in the nature of or essentially the same as a fiduciary relationship. Boeing does not have that type of relationship with the pilots in this case. It doesn't have that relationship with its customers. All of them are very sophisticated arms-length parties that it deals with. Now, it deals with them truthfully, and it aims to deal with them truthfully, but it does not create a special relationship, and the plaintiff's theory would effectively take any complicated piece of machinery that is sold with instructions and to people who rely on those instructions and would create special relationships, as Judge Seeger said, in almost every situation. So we don't believe that Illinois law, there's no case they've cited. In fact, I don't believe they cited any cases in their opening brief, but there's no case that they've cited that would even come close to approximating that. It's really left for fiduciary situations and really unusual dominant control situations like with the Church or with the Boy Scouts cases. Then with regard to the fraudulent misrepresentation claim, if we were to go that far, the complaint, as Judge Scudder pointed out, is very vague on reliance and why these particular pilots did what they did in reaction to statements that the plane was safe. It's not the type of pleading that would normally survive 9B, but, again, that gets into a lot of factual detail that I don't think the court needs to address if the court were to affirm on the basis of proximate cause. And then finally, I will just close by addressing the dismissal with prejudice. Can I pause you on that? Oh, yes, sure. One thing that Mr. Jones may want to speak to it a little bit too, in the discussion of the legal elements of the claim, the plaintiffs leave me with an impression of a bit of a merger between considerations, approximate causation, and reliance. I've never thought of them as definitely not synonymous, but the relationship of them that the plaintiffs suggest seems confusing to me. I guess the question is, under Illinois law, there are two distinct elements, are there not? There are absolutely two distinct elements. I think there might be confusion over cause and fact versus proximate causation, and you can see a position where a statement is made and relied upon in this cause and fact, but that is a wholly different question from proximate cause, which then goes a step further and looks for the direct relationship between the injurious conduct and the actual injury that's alleged. So completely distinct and separate, and the version that the plaintiffs advanced, I believe in their reply brief, would essentially read proximate cause out of Illinois law and would be inconsistent with the whole series of decisions that I mentioned at the outset. And then finally, just on dismissal with prejudice, I addressed Judge Scudder, your question about whether the deferred prosecution agreement would have made a difference. It wouldn't have. And there were four complaints. They've been described as administrative, not substantive. That's actually not accurate. There were claims added, claims taken away. There were some factual allegations made throughout. They acknowledged the second amended complaint was substantive. There were changes made to the third amended complaint as well. So they had lots of opportunities and time to amend, and I would just also note that... What was the timing of the resolutions with the Justice Department and the Securities and Exchange Commission vis-à-vis the third amended complaint? And just what was... And the reason I ask this is Mr. Jones, you know, is putting... I understand why he's putting emphasis on statements in the deferred prosecution agreement that way, but did they come forward in the district court with the argument that, look, this really does change, you know, our pleadings altogether here? Your Honor, there were 20 months passed between the agreement and the deferred prosecution agreement and the entry of that and publication of that and the time that Judge Seeger entered his order. So after the... So the conclusion, therefore, would be, Mr. Jones, that there was ample time after the company executed the deferred prosecution agreement to come forward with a fourth amended complaint or at least seek leave to file and to, you know, proffer how a new complaint would differ from the old complaints. Yeah, that is our contention. Judge Scudder, we agree with that fully. The judge, Judge Seeger, said in his order denying leave for judicial notice, he said, I'm going to look at the complaint. The claims will rise and fall based on what's in the complaint. At that point, it was entirely open to the plaintiffs to seek to leave to amend, to add those allegations to the complaint, and they didn't do that. And then Judge Seeger, in management of his own docket, it took over a year for him to issue the order, and they could have done it at any time. I don't know whether he granted it. He would have granted it. That would be complete speculation, but they never asked. And in this court, they don't say how it would make any difference. So if there are no further questions, we'll rest. I see none. Thank you, counsel. Thank you, Your Honor. Mr. Jones, anything further? Counsel mentioned that with respect to proximate cause, there are many links in the chain. The fatal flaw in that argument, however, is that Boeing was responsible for every step in that chain. The district court listed five steps. That Boeing obtained the MAX certification by fraud on the FAA. That was Boeing's fault. No one else's. The two MAX planes crashed. That was Boeing's fault. No one else's. The entire fleet was grounded. That's Boeing's fault. And finally, the loss of available flights. That's Boeing's fault again. Had they disclosed the MCAS, none of this would have happened. Boeing has admitted that in the DPA, Boeing admitted that the information they provided to pilots, it's quoted in our brief, the information that they provided to pilots was falsely, materially false, incomplete, and misleading. That's to pilots. Mr. Jones, picking up on what I was asking, Mr. Primus, when the company executed the deferred prosecution agreement, did you come forward in the district court and effectively say, this is a quite material development? Because as you're arguing here, you're arguing it very clearly, is that the company made admissions in the deferred prosecution agreement that are quite pertinent to the allegations that are in the third amended complaint. Did you come forward and say, look, we'd like leave to amend the complaint to amplify the allegations in light of the admissions? We didn't because those allegations were already in the complaint. They were just taken lightly by the district court. He dismissed a lot of the allegations as not well pled or the plaintiff's mere say-so or a heavy gloss. Do you say that now though from the perspective of the benefit of hindsight, like looking back at the opinion that you ultimately received in the order dismissing the third amended complaint? Because it seems to me that in real time, when you and your colleagues would have read the deferred prosecution agreement, you would have recognized what it is that you're arguing in your brief. In other words, that these are significant admissions in your view. We believe they were, and we filed a motion for the court to take notice of those admissions, and the court denied it. We did not, as you say, move to amend. I mean, taking notice is different than putting them within the four corners of the complaint. That's correct, but the judge was aware of them and aware that if he filed a motion, if he approved the motion to dismiss, we could amend and the amendment wouldn't be futile, but we did not before that because we felt it was already well-pled in the complaint. He disagreed, but nothing is more well-pled than an admission. Finally, thank you, Mr. Jones. Okay. Thank you. Case is taken under advisement.